Justice Ginsburg,
with whom Justice Sotomayor joins, and with whom Justice Breyer and Justice Kagan join as to Parts I, II, III, and IV, concurring in part, concurring in the judgment in part, and dissenting in part.
I agree with The Chief Justice that the Anti-Injunction Act does not bar the Court’s consideration of these cases, and that the minimum coverage provision is a proper exercise of Congress’ taxing power. I therefore join Parts I, II, and III-C of The Chief Justice’s opinion. Unlike The Chief Justice, however, I would hold, alternatively, that the Commerce Clause authorizes Congress to enact the minimum coverage provision. I would also hold that the Spending Clause permits the Medicaid expansion exactly as Congress enacted it.
I
The provision of health care is today a concern of national dimension, just as the provision of old-age and survivors’ benefits was in the 1930’s. In the Social Security Act, Congress installed a federal system to provide monthly benefits to retired wage earners and, eventually, to their survivors. Beyond question, Congress could have adopted a similar scheme for health care. Congress chose, instead, to preserve a central role for private insurers and state governments. According to The Chief Justice, the Commerce Clause does not permit that preservation. This rigid reading of the Clause makes scant sense and is stunningly retrogressive.
Since 1937, our precedent has recognized Congress’ large authority to set the Nation’s course in the economic and social welfare realm. See United States v. Darby, 312 U. S. 100, 115 (1941) (overruling Hammer v. Dagenhart, 247 U. S. *590 251 (1918), and recognizing that “regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause”); NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 37 (1937) (“[The commerce] power is plenary and may be exerted to protect interstate commerce no matter what the source of the dangers which threaten it.” (internal quotation marks omitted)). The Chief Justice’s crabbed reading of the Commerce Clause harks back to the era in which the Court routinely thwarted Congress’ efforts to regulate the national economy in the interest of those who labor to sustain it. See, e. g., Railroad Retirement Bd. v. Alton R. Co., 295 U. S. 330, 362, 368 (1935) (invalidating compulsory retirement and pension plan for employees of carriers subject to the Interstate Commerce Act; Court found law related essentially “to the social welfare of the worker, and therefore remote from any regulation of commerce as such”). It is a reading that should not have staying power.
A
In enacting the Patient Protection and Affordable Care Act (ACA), Congress comprehensively reformed the national market for health-care products and services. By any measure, that market is immense. Collectively, Americans spent $2.5 trillion on health care in 2009, accounting for 17.6% of our Nation’s economy. 42 U. S. C. § 18091(2)(B) (2006 ed., Supp. IV). Within the next decade, it is anticipated, spending on health care will nearly double. Ibid.
The health-care market’s size is not its only distinctive feature. Unlike the market for almost any other product or service, the market for medical care is one in which all individuals inevitably participate. Virtually every person residing in the United States, sooner or later, will visit a doctor or other health-care professional. See Dept, of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for U. S. Adults: National Health In *591 terview Survey 2009, Ser. 10, No. 249, p. 124 (Dee. 2010) (Table 37) (Over 99.5% of adults above 65 have visited a health-care professional.). Most people will do so repeatedly. See id., at 115 (Table 34) (In 2009 alone, 64% of adults made two or more visits to a doctor’s office.).
When individuals make those visits, they face another reality of the current market for medical care: its high cost. In 2010, on average, an individual in the United States incurred over $7,000 in health-care expenses. Dept, of Health and Human Services, Centers for Medicare and Medicaid Services, Historic National Health Expenditure Data, National Health Expenditures: Selected Calendar Years 1960-2010 (Table 1). Over a lifetime, costs mount to hundreds of thousands of dollars. See Alemayehu & Warner, The Lifetime Distribution of Health Care Costs, in 39 Health Services Research 627, 635 (June 2004). When a person requires nonroutine care, the cost will generally exceed what he or she can afford to pay. A single hospital stay, for instance, typically costs upwards of $10,000. See Dept, of Health and Human Services, Office of Health Policy, ASPE Research Brief: The Value of Health Insurance 5 (May 2011). Treatments for many serious, though not uncommon, conditions similarly cost a substantial sum. Brief for Economic Scholars as Amici Curiae in No. 11-398, p. 10 (citing a study indicating that, in 1998, the cost of treating a heart attack for the first 90 days exceeded $20,000, while the annual cost of treating certain cancers was more than $50,000).
Although every U. S. domiciliary will incur significant medical expenses during his or her lifetime, the time when care will be needed is often unpredictable. An accident, a heart attack, or a cancer diagnosis commonly occurs without warning. Inescapably, we are all at peril of needing medical care without a moment’s notice. See, e. g., Campbell, Down the Insurance Rabbit Hole, N. Y. Times, Apr. 5, 2012, p. A23 (telling of an uninsured 32-year-old woman who, healthy one day, became a quadriplegic the next due to an auto accident).
*592 To manage the risks associated with medical care—its high cost, its unpredictability, and its inevitability—most people in the United States obtain health insurance. Many (approximately 170 million in 2009) are insured by private insurance companies. Others, including those over 65 and certain poor and disabled persons, rely on government-funded insurance programs, notably Medicare and Medicaid. Combined, private health insurers and State and Federal Governments finance almost 85% of the medical care administered to U. S. residents. See Congressional Budget Office, CBO’s 2011 Long-Term Budget Outlook 37 (June 2011).
Not all U. S. residents, however, have health insurance. In 2009, approximately 50 million people were uninsured, either by choice or, more likely, because they could not afford private insurance and did not qualify for government aid. See Dept, of Commerce, Census Bureau, C. DeNavas-Walt, B. Proctor, & J. Smith, Income, Poverty, and Health Insurance Coverage in the United States: 2009, p. 23 (Sept. 2010) (Table 8). As a group, uninsured individuals annually consume more than $100 billion in health-care services, nearly 5% of the Nation’s total. Hidden Health Tax: Americans Pay a Premium 2 (2009), available at http://www.familiesusa. org (all Internet materials as visited June 25, 2012, and included in Clerk of Court’s case file). Over 60% of those without insurance visit a doctor’s office or emergency room in a given year. See Dept, of Health and Human Services, National Center for Health Statistics, Health—United States—2010, p. 282 (Feb. 2011) (Table 79).
B
The large number of individuals without health insurance, Congress found, heavily burdens the national health-care market. See 42 U. S. C. § 18091(2). As just noted, the cost of emergency care or treatment for a serious illness generally exceeds what an individual can afford to pay on her own. Unlike markets for most products, however, the inability to *593 pay for care does not mean that an uninsured individual will receive no care. Federal and state law, as well as professional obligations and embedded social norms, require hospitals and physicians to . provide care when it is most needed, regardless of the patient’s ability to pay. See, e. g., 42 U.S.C. § 1395dd; Fla. Stat. §395.1041(3)(f) (2010); Tex. Health & Safety Code Ann. § 311.022(a) and (b) (West 2010); American Medical Association, Council on Ethical and Judicial Affairs, Code of Medical Ethics, Current Opinions: Opinion 8.11—Neglect of Patient, p. 70 (1998-1999 ed.).
As a consequence, medical-care providers deliver significant amounts of care to the uninsured for which the providers receive no payment. In 2008, for example, hospitals, physicians, and other health-care professionals received no compensation for $43 billion worth of the $116 billion in care they administered to those without insurance. 42 U. S. C. § 18091(2)(F) (2006 ed., Supp. IV).
Health-care providers do not absorb these bad debts. Instead, they raise their prices, passing along the cost of uncompensated care to those who do pay reliably: the government and private insurance companies. In response, private insurers increase their premiums, shifting the cost of the elevated bills from providers onto those who carry insurance. The net result: Those with health insurance subsidize the medical care of those without it. As economists would describe what happens, the uninsured “free ride” on those who pay for health insurance.
The size of this subsidy is considerable. Congress found that the cost shifting just described “increases family [insurance] premiums by on average over $1,000 a year.” Ibid. Higher premiums, in turn, render health insurance less affordable, forcing more people to go without insurance and leading to further cost shifting.
And it is hardly just the currently sick or injured among the uninsured who prompt elevation of the price of health care and health insurance. Insurance companies and health *594 care providers know that some percentage of healthy, uninsured people will suffer sickness or injury each year and will receive medical care despite their inability to pay. In anticipation of this uncompensated care, health-care companies raise their prices, and insurers their premiums. In other words, because any uninsured person may need medical care at any moment and because health-care companies must account for that risk, every uninsured person impacts the market price of medical care and medical insurance.
The failure of individuals to acquire insurance has other deleterious effects on the health-care market. Because those without insurance generally lack access to preventative care, they do not receive treatment for conditions—like hypertension and diabetes—that can be successfully and affordably treated if diagnosed early on. See Institute of Medicine, National Academies, Insuring America’s Health: Principles and Recommendations 43 (2004). When sickness finally drives the uninsured to seek care, once treatable conditions have escalated into grave health problems, requiring more costly and extensive intervention. Id., at 43-44. The extra time and resources providers spend serving the uninsured lessens the providers’ ability to care for those who do have insurance. See Kliff, High Uninsured Rates Can Kill You—Even if You Have Coverage, Washington Post (May 7, 2012) (describing a study of California’s health-care market which found that, when hospitals divert time and resources to provide uncompensated care, the quality of care the hospitals deliver to those with insurance drops significantly), available at http://www.washingtonpost.com/blogs/ezra-klein/post/ highuninsured-rates-can-kill-you-even-if-you-have-coverage/ 2012/05/07/gI QALNHN8T_print.html.
C
States cannot resolve the problem of the uninsured on their own. Like Social Security benefits, a universal healthcare system, if adopted by an individual State, would be “bait *595 to the needy and dependent elsewhere, encouraging them to migrate and seek a haven of repose.” Helvering v. Davis, 301 U. S. 619, 644 (1937). See also Brief for Commonwealth of Massachusetts as Amicus Curiae in No. 11-398, p. 15 (noting that, in 2009, Massachusetts’ emergency rooms served thousands of uninsured, out-of-state residents). An influx of unhealthy individuals into a State with universal health care would result in increased spending on medical services. To cover the increased costs, a State would have to raise taxes, and private health-insurance companies would have to increase premiums. Higher taxes and increased insurance costs would, in turn, encourage businesses and healthy individuals to leave the State.
States that undertake health-care reforms on their own thus risk “placing themselves in a position of economic disadvantage as compared with neighbors or competitors.” Davis, 301 U. S., at 644. See also Brief for Health Care for All, Inc., et al. as Amici Curiae in No. 11-398, p. 4 (“[O]ut-of-state residents continue to seek and receive millions of dollars in uncompensated care in Massachusetts hospitals, limiting the State’s efforts to improve its health care system through the elimination of uncompensated care.”). Facing that risk, individual States are unlikely to take the initiative in addressing the problem of the uninsured, even though solving that problem is in all States’ best interests. Congress’ intervention was needed to overcome this collective-action impasse.
D
Aware that a national solution was required, Congress could have taken over the health-insurance market by establishing a tax-and-spend federal program like Social Security. Such a program, commonly referred to as a single-payer system (where the sole payer is the Federal Government), would have left little, if any, room for private enterprise or the States. Instead of going this route, Congress enacted the ACA, a solution that retains a robust role for private insur *596 ers and state governments. To make its chosen approach work, however, Congress had to use some new tools, including a requirement that most individuals obtain private health-insurance coverage. See 26 U. S. C. § 5000A (2006 ed., Supp. IV) (the minimum coverage provision). As explained below, by employing these tools, Congress was able to achieve a practical, altogether reasonable, solution.
A central aim of the ACA is to reduce the number of uninsured U. S. residents. See 42 U. S. C. § 18091(2)(C) and (I) (2006 ed., Supp. IV). The minimum coverage provision advances this objective by giving potential recipients of health care a financial incentive to acquire insurance. Per the minimum coverage provision, an individual must either obtain insurance or pay a toll constructed as a tax penalty. See 26 U. S. C. § 5000A.
The minimum coverage provision serves a further purpose vital to Congress’ plan to reduce the number of uninsured. Congress knew that encouraging individuals to purchase insurance would not suffice to solve the problem, because most of the uninsured are not uninsured by choice.[1] Of particular concern to Congress were people who, though desperately in need of insurance, often cannot acquire it: persons who suffer from preexisting medical conditions.
Before the ACA’s enactment, private insurance companies took an applicant’s medical history into account when setting insurance rates or deciding whether to insure an individual. Because individuals with preexisting medical conditions cost *597 insurance companies significantly more than those without such conditions, insurers routinely refused to insure these individuals, charged them substantially higher premiums, or offered only limited coverage that did not include the preexisting illness. See Dept, of Health and Human Services, Coverage Denied: How the Current Health Insurance System Leaves Millions Behind 1 (2009) (Over the past three years, 12.6 million nonelderly adults were denied insurance coverage or charged higher premiums due to a preexisting condition.).
To ensure that individuals with medical histories have access to affordable insurance, Congress devised a three-part solution. First, Congress imposed a “guaranteed issue” requirement, which bars insurers from denying coverage to any person on account of that person’s medical condition or history. See 42 U. S. C. §§300gg-1, 300gg-3, 300gg-4(a) (2006 ed., Supp. IV). Second, Congress required insurers to use “community rating” to price their insurance policies. See § 300gg. Community rating, in effect, bars insurance companies from charging higher premiums to those with preexisting conditions.
But these two provisions, Congress comprehended, could not work effectively unless individuals were given a powerful incentive to obtain insurance. See Hearing before the House Ways and Means Committee, 111th Cong., 1st Sess., 10, 13 (2009) (statement of TJwe Reinhardt) (“[Ilmposition of community-rated premiums and guaranteed issue on a market of competing private health insurers will inexorably drive that market into extinction, unless these two features are coupled with ... a mandate on individual[s] to be insured.” (emphasis in original)).
In the 1990⅛, several States—including New York, New Jersey, Washington, Kentucky, Maine, New Hampshire, and Vermont—enacted guaranteed-issue and community-rating laws without requiring universal acquisition of insurance coverage. The results were disastrous. “All seven states *598 suffered from skyrocketing insurance premium costs, reductions in individuals with coverage, and reductions in insurance products and providers.” Brief for American Association of People with Disabilities et al. as Amici Curiae in No. 11-398, p. 9 (hereinafter AAPD Brief). See also Brief for Governor of Washington Christine Gregoire as Amicus Curiae in No. 11-398, pp. 11-14 (describing the “death spiral” in the insurance market Washington experienced when the State passed a law requiring coverage for preexisting conditions).
Congress comprehended that guaranteed-issue and community-rating laws alone will not work. When insurance companies are required to insure the sick at affordable prices, individuals can wait until they become ill to buy insurance. Pretty soon, those in need of immediate medical care—i. e., those who cost insurers the most—become the insurance companies’ main customers. This “adverse selection” problem leaves insurers with two choices: They can either raise premiums dramatically to cover their ever-increasing costs or they can exit the market. In the seven States that tried guaranteed-issue and community-rating requirements without a minimum coverage provision, that is precisely what insurance companies did. See, e. g., AAPD Brief 10 (“[In Maine,] [m]any insurance providers doubled their premiums in just three years or less.”); id., at 12 (“Like New York, Vermont saw substantial increases in premiums after its ... insurance reform measures took effect in 1993.”); Hall, An Evaluation of New York’s Reform Law, 25 J. Health Pol. Pol’y & L. 71, 91-92 (2000) (Guaranteed-issue and community-rating laws resulted in a “dramatic exodus of indemnity insurers from New York’s individual [insurance] market.”); Brief for Barry Friedman et al. as Amici Curiae in No. 11-398, p. 17 (“In Kentucky, all but two insurers (one State-run) abandoned the State.”).
Massachusetts, Congress was told, cracked the adverse- . selection problem. By requiring most residents to obtain insurance, see Mass. Gen. Laws, ch. HIM, §2 (West 2011), *599 the Commonwealth ensured that insurers would not be left with only the sick as customers. As a result, federal lawmakers observed, Massachusetts succeeded where other States had failed. See Brief for Commonwealth of Massachusetts as Amicus Curiae in No. 11-398, at 3 (noting that the Commonwealth’s reforms reduced the number of uninsured residents to less than 2%, the lowest rate in the Nation, and cut the amount of uncompensated care by a third); 42 U. S. C. § 18091(2)(D) (2006 ed., Supp. IV) (noting the success of Massachusetts’ reforms).[2] In coupling the minimum coverage provision with guaranteed-issue and community-rating prescriptions, Congress followed Massachusetts’ lead.
* * *
In sum, Congress passed the minimum coverage provision as a key component of the ACA to address an economic and social problem that has plagued the Nation for decades: the large number of U. S. residents who are unable or unwilling to obtain health insurance. Whatever one thinks of the policy decision Congress made, it was Congress’ prerogative to make it. Reviewed with appropriate deference, the minimum coverage provision, allied to the guaranteed-issue and community-rating prescriptions, should survive measurement under the Commerce and Necessary and Proper Clauses.
rH
A
The Commerce Clause, it is widely acknowledged, “was the Framers’ response to the central problem that gave rise to the Constitution itself.” EEOC v. Wyoming, 460 U. S. 226, 244, 245, n. 1 (1983) (Stevens, J., concurring) (citing sources). Under the Articles of Confederation, the Consti *600 tution’s precursor, the regulation of commerce was left to the States. This scheme proved unworkable, because the individual States, understandably focused on their own economic interests, often failed to take actions critical to the success of the Nation as a whole. See Vices of the Political System of the United States, in James Madison: Writings 69, 71, ¶ 5 (J. Rakove ed. 1999) (As a result of the “want of concert in matters where common interest requires it,” the “national dignity, interest, and revenue [have] suffered.”).[3]
What was needed was a “national Government. . . armed with a positive & compleat authority in all cases where uniform measures are necessary.” See Letter from James Madison to Edmund Randolph (Apr. 8, 1787), in 9 Papers of James Madison 368, 370 (R. Rutland ed. 1975). See also Letter from George Washington to James Madison (Nov. 30, 1785), in 8 id., at 428, 429 (“We are either a United people, or we are not. If the former, let us, in all matters of general concern act as a nation, which ha[s] national objects to promote, and a national character to support.”). The Framers’ solution was the Commerce Clause, which, as they perceived it, granted Congress the authority to enact economic legislation “in all Cases for the general Interests of the Union, and also in those Cases to which the States are separately incompetent.” 2 Records of the Federal Convention of 1787, pp. 131-132, ¶ 8 (M. Farrand rev. 1966). See also North American Co. v. SEC, 327 U. S. 686, 705 (1946) (“[The commerce power] is an affirmative power commensurate with the national needs.”).
*601 The Framers understood that the “general Interests of the Union” would change over time, in ways they could not anticipate. Accordingly, they recognized that the Constitution was of necessity a “great outlin[e],” not a detailed blueprint, see McCulloch v. Maryland, 4 Wheat. 316, 407 (1819), and that its provisions included broad concepts, to be “explained by the context or by the facts of the case,” Letter from James Madison to N. P. Trist (Dec. 1831), in 9 Writings of James Madison 471, 475 (G. Hunt ed. 1910). “Nothing . . . can be more fallacious,” Alexander Hamilton emphasized, “than to infer the extent of any power, proper to be lodged in the national government, from ... its immediate necessities. There ought to be a capacity to provide for future contingencies^] as they may happen; and as these are illimitable in their nature, it is impossible safely to limit that capacity.” The Federalist No. 34, pp. 205, 206 (John Harvard Library ed. 2009). See also McCulloch, 4 Wheat., at 415 (The Necessary and Proper Clause is lodged “in a constitution[,] intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.”).
B
Consistent with the Framers’ intent, we have repeatedly emphasized that Congress’ authority under the Commerce Clause is dependent upon “practical” considerations, including “actual experience.” Jones & Laughlin Steel Corp., 301 U. S., at 41-42; see Wickard v. Filburn, 317 U. S. 111, 122 (1942); United States v. Lopez, 514 U. S. 549, 573 (1995) (Kennedy, J., concurring) (emphasizing “the Court’s definitive commitment to the practical conception of the commerce power”). See also North American Co., 327 U. S., at 705 (“Commerce itself is an intensely practical matter. To deal with it effectively, Congress must be able to act in terms of economic and financial realities.” (citation omitted)). We afford Congress the leeway “to undertake to solve national *602 problems directly and realistically.” American Power & Light Co. v. SEC, 329 U. S. 90, 103 (1946).
Until today, this Court’s pragmatic approach to judging whether Congress validly exercised its commerce power was guided by two familiar principles. First, Congress has the power to regulate economic activities “that substantially affect interstate commerce.” Gonzales v. Raich, 545 U. S. 1, 17 (2005). This capacious power extends even to local activities that, viewed in the aggregate, have a substantial impact on interstate commerce. See ibid. See also Wickard, 317 U. S., at 125 (“[E]ven if appellee’s activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.” (emphasis added)); Jones & Laughlin Steel Corp., 301 U. S., at 37.
Second, we owe a large measure of respect to Congress when it frames and enacts economic and social legislation. See Raich, 545 U. S., at 17. See also Pension Benefit Guaranty Corporation v. R. A. Gray & Co., 467 U. S. 717, 729 (1984) (“[S]trong deference [is] accorded legislation in the field of national economic policy.”); Hodel v. Indiana, 452 U. S. 314, 326 (1981) (“This [C]ourt will certainly not substitute its judgment for that of Congress unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent.” (internal quotation marks omitted)). When appraising such legislation, we ask only (1) whether Congress had a “rational basis” for concluding that the regulated activity substantially affects interstate commerce, and (2) whether there is a “reasonable connection between the regulatory means selected and the asserted ends.” Id., at 323-324. See also Raich, 545 U. S., at 22; Lopez, 514 U. S., at 557; Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U. S. 264, 277 (1981); Katzenbach v. McClung, 379 U. S. 294, 303 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241, 258 (1964); United States v. *603 Carolene Products Co., 304 U. S. 144, 152-153 (1938). In answering these questions, we presume the statute under review is constitutional and may strike it down only on a “plain showing” that Congress acted irrationally. United States v. Morrison, 529 U. S. 598, 607 (2000).
C
Straightforward application of these principles would require the Court to hold that the minimum coverage provision is proper Commerce Clause legislation. Beyond dispute, Congress had a rational basis for concluding that the uninsured, as a class, substantially affect interstate commerce. Those without insurance consume billions of dollars of health-care products and services each year. See supra, at 592. Those goods are produced, sold, and delivered largely by national and regional companies who routinely transact business across state lines. The uninsured also cross state lines to receive care. Some have medical emergencies while away from home. Others, when sick, go to a neighboring State that provides better care for those who have not prepaid for care. See supra, at 594-595.
Not only do those without insurance consume a large amount of health care each year; critically, as earlier explained, their inability to pay for a significant portion of that consumption drives up market prices, foists costs on other consumers, and reduces market efficiency and stability. See supra, at 593-594. Given these far-reaching effects on interstate commerce, the decision to forgo insurance is hardly inconsequential or equivalent to “doing nothing,” ante, at 552; it is, instead, an economic decision Congress has the authority to address under the Commerce Clause. See supra, at 601-602 and this page. See also Wickard, 317 U. S., at 128 (“It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices.” (emphasis added)).
*604 The minimum coverage provision, furthermore, bears a “reasonable connection” to Congress’ goal of protecting the health-care market from the disruption caused by individuals who fail to obtain insurance. By requiring those who do not carry insurance to pay a toll, the minimum coverage provision gives individuals a strong incentive to insure. This incentive, Congress had good reason to believe, would reduce the number of uninsured and, correspondingly, mitigate the adverse impact the uninsured have on the national health-care market.
Congress also acted reasonably in requiring uninsured individuals, whether sick or healthy, either to obtain insurance or to pay the specified penalty. As earlier observed, because every person is at risk of needing care at any moment, all those who lack insurance, regardless of their current health status, adversely affect the price of health care and health insurance. See supra, at 593-594. Moreover, an insurance-purchase requirement limited to those in need of immediate care simply could not work. Insurance companies would either charge these individuals prohibitively expensive premiums, or, if community-rating regulations were in place, close up shop. See supra, at 597-598. See also Brief for State of Maryland et al. as Amici Curiae in No. 11-398, p. 28 (hereinafter Maryland Brief) (“No insurance regime can survive if people can opt out when the risk insured against is only a risk, but opt in when the risk materializes.”).
“[W]here we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.” Katzenbach, 379 U. S., at 303-304. Congress’ enactment of the minimum coverage provision, which addresses a specific interstate problem in a practical, experience-informed manner, easily meets this criterion.
D
Rather than evaluating the constitutionality of the minimum coverage provision in the manner established by our *605 precedents, The Chief Justice relies on a newly minted constitutional doctrine. The commerce power does not, The Chief Justice announces, permit Congress to “eompe[l] individuals to become active in commerce by purchasing a product.” Ante, at 552 (emphasis deleted).
1
a
The Chief Justice’s novel constraint on Congress’ commerce power gains no force from our precedent and for that reason alone warrants disapprobation. See infra, at 609-613. But even assuming, for the moment, that Congress lacks authority under the Commerce Clause to “compel individuals not engaged in commerce to purchase an unwanted product,” ante, at 549, such a limitation would be inapplicable here. Everyone will, at some point, consume health-care products and services. See supra, at 590-591. Thus, if The Chief Justice is correct that an insurance-purchase requirement can be applied only to those who “actively” consume health care, the minimum coverage provision fits the bill.
The Chief Justice does not dispute that all U. S. residents participate in the market for health services over the course of their lives. See ante, at 547 (“Everyone will eventually need health care at a time and to an extent they cannot predict.”). But, The Chief Justice insists, the uninsured cannot be considered active in the market for health care, because “[t]he proximity and degree of connection between the [uninsured today] and [their] subsequent commercial activity is too lacking.” Ante, at 558.
This argument has multiple flaws. First, more than 60% of those without insurance visit a hospital or doctor’s office each year. See supra, at 592. Nearly 90% will within five years.[4] An uninsured’s consumption of health care is thus *606 quite proximate: It is virtually certain to occur in the next five years and more likely than not to occur this year.
Equally evident, Congress has no way of separating those uninsured individuals who will need emergency medical care today (surely their consumption of medical care is sufficiently imminent) from those who will not need medical services for years to come. No one knows when an emergency will occur, yet emergencies involving the uninsured arise daily. To capture individuals who unexpectedly will obtain medical care in the very near future, then, Congress needed to include individuals who will not go to a doctor anytime soon. Congress, our decisions instruct, has authority to cast its net that wide. See Perez v. United States, 402 U. S. 146, 154 (1971) (“[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.” (internal quotation marks omitted)).[5]
Second, it is Congress’ role, not the Court’s, to delineate the boundaries of the market the Legislature seeks to regulate. The Chief Justice defines the health-care market as including only those transactions that will occur either in the next instant or within some (unspecified) proximity to the next instant. But Congress could reasonably have viewed the market from a long-term perspective, encompassing all transactions virtually certain to occur over the next decade, see supra, at 605 and this page, not just those occurring here and now.
Third, contrary to The Chief Justice’s contention, our precedent does indeed support “[t]he proposition that Con *607 gress may dictate the conduct of an individual today because of prophesied future activity.” Ante, at 557. In Wickard, the Court upheld a penalty the Federal Government imposed on a farmer who grew more wheat than he was permitted to grow under the Agricultural Adjustment Act of 1938 (AAA). 317 U. S., at 114-115. He could not be penalized, the farmer argued, as he was growing the wheat for home consumption, not for sale on the open market. Id., at 119. The Court rejected this argument. Id., at 127-129. Wheat intended for home consumption, the Court noted, “overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases [intended by the AAA].” Id., at 128.
Similar reasoning supported the Court’s judgment in Raich, which upheld Congress’ authority to regulate marijuana grown for personal use. 545 U. S., at 19. Homegrown marijuana substantially affects the interstate market for marijuana, we observed, for “the high demand in the interstate market will [likely] draw such marijuana into that market.” Ibid.
Our decisions thus acknowledge Congress’ authority, under the Commerce Clause, to direct the conduct of an individual today (the farmer in Wickard, stopped from growing excess wheat; the plaintiff in Raich, ordered to cease cultivating marijuana) because of a prophesied future transaction (the eventual sale of that wheat or marijuana in the interstate market). Congress’ actions are even more rational here, where the future activity (the consumption of medical care) is certain to occur, the sole uncertainty being the time the activity will take place.
Maintaining that the uninsured are not active in the health-care market, The Chief Justice draws an analogy to the car market. An individual “is not ‘active in the car market,’ ” The Chief Justice observes, simply because he or she may someday buy a car. Ante, at 556. The analogy is inapt. The inevitable yet unpredictable need for medical care and the guarantee that emergency care will be provided *608 when required are conditions nonexistent in other markets. That is so of the market for cars, and of the market for broccoli as well. Although an individual might buy a car or a crown of broccoli one day, there is no certainty she will ever do so. And if she eventually wants a car or has a craving for broccoli, she will be obliged to pay at the counter before receiving the vehicle or nourishment. She will get no free ride or food, at the expense of another consumer forced to pay an inflated price. See Thomas More Law Center v. Obama, 651 F. 3d 529, 565 (CA6 2011) (Sutton, J., concurring in part) (“Regulating how citizens pay for what they already receive (health care), never quite know when they will need, and in the case of severe illnesses or emergencies generally will not be able to afford, has few (if any) parallels in modern life.”)- Upholding the minimum coverage provision on the ground that all are participants or will be participants in the health-care market would therefore carry no implication that Congress may justify under the Commerce Clause a mandate to buy other products and services.
Nor is it accurate to say that the minimum coverage provision “compel[s] individuals ... to purchase an unwanted product,” ante, at 549, or “suite of products,” post, at 656, n. 2 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).
If unwanted today, medical service secured by insurance may be desperately needed tomorrow. Virtually everyone, I reiterate, consumes health care at some point in his or her life. See supra, at 590-591. Health insurance is a means of paying for this care, nothing more. In requiring individuals to obtain insurance, Congress is therefore not mandating the purchase of a discrete, unwanted product. Rather, Congress is merely defining the terms on which individuals pay for an interstate good they consume: Persons subject to the mandate must now pay for medical care in advance (instead of at the point of service) and through insurance (instead of out of pocket). Establishing payment terms for goods in or *609 affecting interstate commerce is quintessential economic regulation well within Congress’ domain. See, e.g., United States v. Wrightwood Dairy Co., 315 U. S. 110, 118 (1942). Cf. post, at 657 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.) (recognizing that “the Federal Government can prescribe [a commodity’s] quality . . . and even [its price]”).
The Chief Justice also calls the minimum coverage provision an illegitimate effort to make young, healthy individuals subsidize insurance premiums paid by the less hale and hardy. See ante, at 548, 556-557. This complaint, too, is spurious. Under the current health-care system, healthy persons who lack insurance receive a benefit for which they do not pay: They are assured that, if they need it, emergency medical care will be available, although they cannot afford it. See supra, at 592-593. Those who have insurance bear the cost of this guarantee. See ibid. By requiring the healthy uninsured to obtain insurance or pay a penalty structured as a tax, the minimum coverage provision ends the free ride these individuals currently enjoy.
In the fullness of time, moreover, today’s young and healthy will become society’s old and infirm. Viewed over a lifespan, the costs and benefits even out: The young who pay more than their fair share currently will pay less than their fair share when they become senior citizens. And even if, as undoubtedly will be the case, some individuals, over their lifespans, will pay more for health insurance than they receive in health services, they have little to complain about, for that is how insurance works. Every insured person receives protection against a catastrophic loss, even though only a subset of the covered class will ultimately need that protection.
b
In any event, The Chief Justice’s limitation of the commerce power to the regulation of those actively engaged in commerce finds no home in the text of the Constitution or *610 our decisions. Article I, § 8, of the Constitution grants Congress the power “[t]o regulate Commerce ... among the several States.” Nothing in this language implies that Congress’ commerce power is limited to regulating those actively engaged in commercial transactions. Indeed, as the D. C. Circuit observed, “[a]t the time the Constitution was [framed], to ‘regulate’ meant,” among other things, “to require action.” See Seven-Sky v. Holder, 661 F. 3d 1, 16 (2011).
Arguing to the contrary, The Chief Justice notes that “the Constitution gives Congress the power to ‘coin Money,’ in addition to the power to ‘regulate the Value thereof,’ ” and similarly “gives Congress the power to ‘raise and support Armies’ and to ‘provide and maintain a Navy,’ in addition to the power to ‘make Rules for the Government and Regulation of the land and naval Forces.’” Ante, at 550 (citing Art. I, § 8, cls. 5, 12-14). In separating the power to regulate from the power to bring the subject of the regulation into existence, The Chief Justice asserts, “[t]he language of the Constitution reflects the natural understanding that the power to regulate assumes there is already something to be regulated.” Ante, at 550.
This argument is difficult to fathom. Requiring individuals to obtain insurance unquestionably regulates the interstate health-insurance and health-care markets, both of them in existence well before the enactment of the ACA. See Wickard, 317 U. S., at 128 (“The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon.”). Thus, the “something to be regulated” was surely there when Congress created the minimum coverage provision.[6]
*611 Nor does our case law toe the activity versus inactivity line. In Wickard, for example, we upheld the penalty imposed on a farmer who grew too much wheat, even though the regulation had the effect, of compelling farmers to purchase wheat in the open market. Id., at 127-129. “[Forcing some farmers into the market to buy what they could provide for themselves” was, the Court held, a valid means of regulating commerce. Id., at 128-129. In another context, this Court similarly upheld Congress’ authority under the commerce power to compel an “inactive” landholder to submit to an unwanted sale. See Monongahela Nav. Co. v. United States, 148 U. S. 312, 335-337 (1893) (“[U]pon the [great] power to regulate comrnerce[,]” Congress has the authority to mandate the sale of real property to the Government, where the sale is essential to the improvement of a navigable waterway, (emphasis added)); Cherokee Nation v. Southern Kansas R. Co., 135 U. S. 641, 657-659 (1890) (similar reliance on the commerce power regarding mandated sale of private property for railroad construction).
In concluding that the Commerce Clause does not permit Congress to regulate commercial “inactivity,” and therefore does not allow Congress to adopt the practical solution it devised for the health-care problem, The Chief Justice views the Clause as a “technical legal conception,” precisely what our case law tells us not to do. Wickard, 317 U. S., at 122 (internal quotation marks omitted). See also supra, at 601-604. This Court’s former endeavors to impose categorical limits on the commerce power have not fared well. In several pre-New Deal cases, the Court attempted to cabin Congress’ Commerce Clause authority by distinguishing “commerce” from activity once conceived to be noncommercial, notably, “production,” “mining,” and “manufacturing.” See, e. g., United States v. E. C. Knight Co., 156 U. S. 1, 12 *612 (1895) (“Commerce succeeds to manufacture, and is not a part of it.”); Carter v. Carter Coal Co., 298 U. S. 238, 304 (1936) (“Mining brings the subject matter of commerce into existence. Commerce disposes of it.”). The Court also sought to distinguish activities having a “direct” effect on interstate commerce, and for that reason, subject to federal regulation, from those having only an “indirect” effect, and therefore not amenable to federal control. See, e. g., A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, 548 (1935) (“[T]he distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one.”).
These line-drawing exercises were untenable, and the Court long ago abandoned them. “[Questions of the power of Congress [under the Commerce Clause],” we held in Wick-ard, “are not to be decided by reference to any formula which would give controlling force to nomenclature such as ‘production’ and ‘indirect’ and foreclose consideration of the actual effects of the activity in question upon interstate commerce.” 317 U. S., at 120. See also Morrison, 529 U. S., at 641-644 (Souter, J., dissenting) (recounting the Court’s “nearly disastrous experiment” with formalistic limits on Congress’ commerce power). Failing to learn from this history, The Chief Justice plows ahead with his formalistic distinction between those who are “active in commerce,” ante, at 552, and those who are not.
It is not hard to show the difficulty courts (and Congress) would encounter in distinguishing statutes that regulate “activity” from those that regulate “inactivity.” As Judge Easterbrook noted, “it is possible to restate most actions as corresponding inactions with the same effect.” Archie v. Racine, 847 F. 2d 1211, 1213 (CA7 1988) (en banc). Take the instant litigation as an example. An individual who opts not to purchase insurance from a private insurer can be seen as actively selecting another form of insurance: self-insurance. See Thomas More Law Center, 651 F. 3d, at 561 (Sutton, J., *613 concurring in part) (“No one is inactive when deciding how to pay for health care, as self-insurance and private insurance are two forms of action for addressing the same risk.”). The minimum coverage provision could therefore be described as regulating activists in the self-insurance market.[7] Wickard is another example. Did the statute there at issue target activity (the growing of too much wheat) or inactivity (the farmer’s failure to purchase wheat in the marketplace)? If anything, the Court’s analysis suggested the latter. See 317 U. S., at 127-129.
At bottom, The Chief Justice’s and the joint dissenters’ “view that an individual cannot be subject to Commerce Clause regulation absent voluntary, affirmative acts that enter him or her into, or affect, the interstate market expresses a concern for individual liberty that [is] more redolent of Due Process Clause arguments.” Seven-Sky, 661 F. 3d, at 19. See also Troxel v. Granville, 530 U. S. 57, 65 (2000) (plurality opinion) (“The [Due Process] Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.” (internal quotation marks omitted)). Plaintiffs have abandoned any argument pinned to substantive due process, however, see 648 F. 3d 1235, 1291, n. 93 (CA11 2011), and now concede that the provisions here at issue do not offend the Due Process Clause.[8]
*614 2
Underlying The Chief Justice’s view that the Commerce Clause must be confined to the regulation of active participants in a commercial market is a fear that the commerce power would otherwise know no limits. See, e.g., ante, at 554 (Allowing Congress to compel an individual not engaged in commerce to purchase a product would “permi[t] Congress to reach beyond the natural extent of its authority, everywhere extending the sphere of its activity and drawing all power into its impetuous vortex.” (internal quotation marks omitted)). The joint dissenters express a similar apprehension. See post, at 653 (If the minimum coverage provision is upheld under the commerce power then “the Commerce Clause becomes a font of unlimited power,... the hideous monster whose devouring jaws ... spare neither sex nor age, nor high nor low, nor sacred nor profane.” (internal quotation marks omitted)). This concern is unfounded.
First, The Chief Justice could certainly uphold the individual mandate without giving Congress carte blanche to enact any and all purchase mandates. As several times noted, the unique attributes of the health-care market render everyone active in that market and give rise to a significant free-riding problem that does not occur in other markets. See supra, at 590-594, 603-606, 608-609.
Nor would the commerce power be unbridled, absent The Chief Justice’s “activity” limitation. Congress would remain unable to regulate noneconomic conduct that has only an attenuated effect on interstate commerce and is traditionally left to state law. See Lopez, 514 U. S., at 567; Morrison, 529 U. S., at 617-619. In Lopez, for example, the Court held that the Federal Government lacked power, under the Commerce Clause, to criminalize the possession of a gun in a *615 local school zone. Possessing a gun near a school, the Court reasoned, “is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.” 514 U. S., at 567; ibid, (noting that the Court would have “to pile inference upon inference” to conclude that gun possession has a substantial effect on commerce). Relying on similar logic, the Court concluded in Morrison that Congress could not regulate gender-motivated violence, which the Court deemed to have too “attenuated [an] effect upon interstate commerce.” 529 U. S., at 615.
An individual’s decision to self-insure, I have explained, is an economic act with the requisite connection to interstate commerce. See supra, at 603-604. Other choices individuals make are unlikely to fit the same or similar description. As an example of the type of regulation he fears, The Chief Justice cites a Government mandate to purchase green vegetables. Ante, at 553-554. One could call this concern “the broccoli horrible.” Congress, The Chief Justice posits, might adopt such a mandate, reasoning that an individual’s failure to eat a healthy diet, like the failure to purchase health insurance, imposes costs on others. See ibid.
Consider the chain of inferences the Court would have to accept to conclude that a vegetable-purchase mandate was likely to have a substantial effect on the health-care costs borne by lithe Americans. The Court would have to believe that individuals forced to buy vegetables would then eat them (instead of throwing or giving them away), would prepare the vegetables in a healthy way (steamed or raw, not deep fried), would cut back on unhealthy foods, and would not allow other factors (such as lack of exercise or little sleep) to trump the improved diet.[9] Such “pil[ing of] infer *616 ence upon inference” is just what the Court refused to do in Lopez and Morrison.
Other provisions of the Constitution also check congressional overreaching. A mandate to purchase a particular product would be unconstitutional if, for example, the edict impermissibly abridged the freedom of speech, interfered with the free exercise of religion, or infringed on a liberty interest protected by the Due Process Clause.
Supplementing these legal restraints is a formidable check on congressional power: the democratic process. See Raich, 545 U. S., at 33; Wickard, 317 U. S., at 120 (repeating Chief Justice Marshall’s “warning that effective restraints on [the commerce power’s] exercise must proceed from political rather than judicial processes” (citing Gibbons v. Ogden, 9 Wheat. 1, 197 (1824))). As the controversy surrounding the passage of the ACA attests, purchase mandates are likely to engender political resistance. This prospect is borne out by the behavior of state legislators. Despite their possession of unquestioned authority to impose mandates, state governments have rarely done so. See Hall, Commerce Clause Challenges to Health Care Reform, 159 U. Pa. L. Rev. 1825, 1838 (2011).
When contemplated in its extreme, almost any power looks dangerous. The commerce power, hypothetically, would enable Congress to prohibit the purchase and home production of all meat, fish, and dairy goods, effectively compelling Americans to eat only vegetables. Cf. Raich, 545 U. S., at 9; Wickard, 317 U. S., at 127-129. Yet no one would offer the “hypothetical and unreal possibility], ” Pullman Co. v. Knott, 235 U. S. 23, 26 (1914), of a vegetarian state as a credi *617 ble reason to deny Congress the authority ever to ban the possession and sale of goods. The Chief Justice accepts just such specious logic when he cites the broccoli horrible as a reason to deny Congress the power to pass the individual mandate. Cf. R. Bork, The Tempting of America 169 (1990) (“Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.”). But see, e. g., post, at 648 (joint opinion of Scalia, Kennedy, Thomas, and Auto, JJ.) (asserting, outlandishly, that if the minimum coverage provision is sustained, then Congress could make “breathing in and out the basis for federal prescription”).
3
To bolster his argument that the minimum coverage provision is not valid Commerce Clause legislation, The Chief Justice emphasizes the provision’s novelty. See ante, at 549 (asserting that “sometimes the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent for Congress’s action” (internal quotation marks omitted)). While an insurance-purchase mandate may be novel, The Chief Justice’s argument certainly is not. “[I]n almost every instance of the exercise of the [commerce] power differences are asserted from previous exercises of it and made a ground of attack.” Hoke v. United States, 227 U. S. 308, 320 (1913). See, e. g., Brief for Petitioner in Perez v. United States, O. T. 1970, No. 600, p. 5 (“unprecedented exercise of power”); Supplemental Brief for Appellees in Katzenbach v. McClung, O. T. 1964, No. 543, p. 40 (“novel assertion of federal power”); Brief for Appellee in Wickard v. Filburn, O. T. 1941, No. 59, p. 6 (“complete departure”). For decades, the Court has declined to override legislation because of its novelty, and for good reason. As our national economy grows and changes, we have recognized, Congress must adapt to the changing “economic and financial realities.” See supra, at 601. Hindering Congress’ ability to do so is shortsighted; if history is any guide, today’s constric *618 tion of the Commerce Clause will not endure. See supra, at 612-613.
rH HH HH
A
For the reasons explained above, the minimum coverage provision is valid Commerce Clause legislation. See Part II, supra. When viewed as a component of the entire ACA, the provision’s constitutionality becomes even plainer.
The Necessary and Proper Clause “empowers Congress to enact laws in effectuation of its [commerce] powe[r] that are not within its authority to enact in isolation.” Raich, 545 U. S., at 39 (Scalia, J., concurring in judgment). Hence, “[a] complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal.” Indiana, 452 U. S., at 329, n. 17. “It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.” Ibid, (collecting cases). See also Raich, 545 U. S., at 24-25 (A challenged statutory provision fits within Congress’ commerce authority if it is an “essential par[t] of a larger regulation of economic activity,” such that, in the absence of the provision, “the regulatory scheme could be undercut.” (quoting Lopez, 514 U. S., at 561)); Raich, 545 U. S., at 37 (Scalia, J., concurring in judgment) (“Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce. The relevant question is simply whether the means chosen are ‘reasonably adapted’ to the attainment of a legitimate end under the commerce power.” (citation omitted)).
Recall that one of Congress’ goals in enacting the ACA was to eliminate the insurance industry’s practice of charging higher prices or denying coverage to individuals with preexisting medical conditions. See supra, at 596-597. *619 The commerce power allows Congress to ban this practice, a point no one disputes. See United States v. South-Eastern Underwriters Assn., 322 U. S. 533, 545, 552-553 (1944) (Congress may regulate “the methods by which interstate insurance companies do business.”).
Congress knew, however, that simply barring insurance companies from relying on an applicant’s medical history would not work in practice. Without the individual mandate, Congress learned, guaranteed-issue and community-rating requirements would trigger an adverse-selection death spiral in the health-insurance market: Insurance premiums would skyrocket, the number of uninsured would increase, and insurance companies would exit the market. See supra, at 597-598. When complemented by an insurance mandate, on the other hand, guaranteed issue and community rating would work as intended, increasing access to insurance and reducing uncompensated care. See supra, at 598-599. The minimum coverage provision is thus an “essential par[t] of a larger regulation of economic activity”; without the provision, “the regulatory scheme [w]ould be undercut.” Raich, 545 U. S., at 24-25 (internal quotation marks omitted). Put differently, the minimum coverage provision, together with the guaranteed-issue and community-rating requirements, is “ ‘reasonably adapted’ to the attainment of a legitimate end under the commerce power”: the elimination of pricing and sales practices that take an applicant’s medical history into account. See id., at 37 (Scalia, J., concurring in judgment).
B
Asserting that the Necessary and Proper Clause does not authorize the minimum coverage provision, The Chief Justice focuses on the word “proper.” A mandate to purchase health insurance is not “proper” legislation, The Chief Justice urges, because the command “undermine[s] the structure of government established by the Constitu *620 tion.” Ante, at 559. If long on rhetoric, The Chief Justice’s argument is short on substance.
The Chief Justice cites only two cases in which this Court concluded that a federal statute impermissibly transgressed the Constitution’s boundary between state and federal authority: Printz v. United States, 521 U. S. 898 (1997), and New York v. United States, 505 U. S. 144 (1992). See ante, at 559. The statutes at issue in both cases, however, compelled state officials to act on the Federal Government’s behalf. Printz, 521 U. S., at 925-933 (holding unconstitutional a statute obligating state law enforcement officers to implement a federal gun-control law); New York, 505 U. S., at 176-177 (striking down a statute requiring state legislators to pass regulations pursuant to Congress’ instructions). “[Federal] laws conscripting state officers,” the Court reasoned, “violate state sovereignty and are thus not in accord with the Constitution.” Printz, 521 U. S., at 925, 935; New York, 505 U. S., at 176.
The minimum coverage provision, in contrast, acts “directly upon individuals, without employing the States as intermediaries.” New York, 505 U. S., at 164. The provision is thus entirely consistent with the Constitution’s design. See Printz, 521 U. S., at 920 (“[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States.” (internal quotation marks omitted)).
Lacking case law support for his holding, The Chief Justice nevertheless declares the minimum coverage provision not “proper” because it is less “narrow in scope” than other laws this Court has upheld under the Necessary and Proper Clause. Ante, at 560 (citing United States v. Comstock, 560 U. S. 126 (2010); Sabri v. United States, 541 U. S. 600 (2004); Jinks v. Richland County, 538 U. S. 456 (2003)). The Chief Justice’s reliance on cases in which this Court has affirmed Congress’ “broad authority to enact federal legislation” under the Necessary and Proper Clause, Comstock, 560 U. S., at 133, is underwhelming.
*621 Nor does The Chief Justice pause to explain why the power to direct either the purchase of health insurance or, alternatively, the payment of a penalty collectible as a tax is more far reaching than other implied powers this Court has found meet under the Necessary and Proper Clause. These powers include the power to enact criminal laws, see, e. g., United States v. Fox, 95 U. S. 670, 672 (1878); the power to imprison, including civil imprisonment, see, e. g., Comstock, 560 U. S., at 129-130; and the power to create a national bank, see McCulloch, 4 Wheat., at 425. See also Jinks, 538 U. S., at 463 (affirming Congress’ power to alter the way a state law is applied in state court, where the alteration “promotes fair and efficient operation of the federal courts”).[10]
In failing to explain why the individual mandate threatens our constitutional order, The Chief Justice disserves future courts. How is a judge to decide, when ruling on the constitutionality of a federal statute, whether Congress employed an “independent power,” ante, at 559, or merely a “derivative” one, ante, at 560? Whether the power used is “substantive,” ante, at 561, or just “incidental,” ante, at 560? The instruction The Chief Justice, in effect, provides lower courts: You will know it when you see it.
It is more than exaggeration to suggest that the minimum coverage provision improperly intrudes on “essential attributes of state sovereignty.” Ibid, (internal quotation marks omitted). First, the ACA does not operate “in [an] are[a] such as criminal law enforcement or education where States historically have been sovereign.” Lopez, 514 U. S., at 564. *622 As evidenced by Medicare, Medicaid, the Employee Retirement Income Security Act of 1974, and the Health Insurance Portability and Accountability Act of 1996, the Federal Government plays a lead role in the health-care sector, both as a direct payer and as a regulator.
Second, and perhaps most important, the minimum coverage provision, along with other provisions of the ACA, addresses the very sort of interstate problem that made the commerce power essential in our federal system. See supra, at 599-602. The crisis created by the large number of U. S. residents who lack health insurance is one of national dimension that States are “separately incompetent” to handle. See supra, at 594-595, 600. See also Maryland Brief 15-26 (describing “the impediments to effective state policy-making that flow from the interconnectedness of each state’s healthcare economy” and emphasizing that “state-level reforms cannot fully address the problems associated with uncompensated care”). Far from trampling on States’ sovereignty, the ACA attempts a federal solution for the very reason that the States, acting separately, cannot meet the need. Notably, the ACA serves the general welfare of the people of the United States while retaining a prominent role for the States. See id., at 31-36 (explaining and illustrating how the ACA affords States wide latitude in implementing key elements of the Act’s reforms).[11]
*623 > I—t
In the early 20th century, this Court regularly struck down economic regulation enacted by the peoples’ representatives in both the States and the Federal Government. See, e. g., Carter Coal Co., 298 U. S., at 303-304, 309-310; Dagenhart, 247 U. S., at 276-277; Lochner v. New York, 198 U. S. 45, 64 (1905). The Chief Justice’s Commerce Clause opinion, and even more so the joint dissenters’ reasoning, see post, at 649-660, bear a disquieting resemblance to those long-overruled decisions.
Ultimately, the Court upholds the individual mandate as a proper exercise of Congress’ power to tax and spend “for the . . . general Welfare of the United States.” Art. I, § 8, cl. 1; ante, at 573-574. I concur in that determination, which makes The Chief Justice’s Commerce Clause essay all the more puzzling. Why should The Chief Justice strive so mightily to hem in Congress’ capacity to meet the new problems arising constantly in our ever-developing modern economy? I find no satisfying response to that question in his opinion.[12]
*624 V
Through Medicaid, Congress has offered the States an opportunity to furnish health care to the poor with the aid of federal financing. To receive federal Medicaid funds, States must provide health benefits to specified categories of needy persons, including pregnant women, children, parents, and adults with disabilities. Guaranteed eligibility varies by category: for some it is tied to the federal poverty level (incomes up to 100% or 133%); for others it depends on criteria such as eligibility for designated state or federal assistance programs. The ACA enlarges the population of needy people States must cover to include adults under age 65 with incomes up to 133% of the federal poverty level. The spending power conferred by the Constitution, the Court has never doubted, permits Congress to define the contours of programs financed with federal funds. See, e. g., Pennhurst State School and Hospital v. Halderman, 451 U. S. 1, 17 (1981). And to expand coverage, Congress could have recalled the existing legislation, and replaced it with a new law making Medicaid as embracive of the poor as Congress chose.
The question posed by the 2010 Medicaid expansion, then, is essentially this: To cover a notably larger population, must Congress take the repeal/reenact route, or may it achieve the same result by amending existing law? The answer should be that Congress may expand by amendment the classes of needy persons entitled to Medicaid benefits. A ritualistic requirement that Congress repeal and reenact spending legislation in order to enlarge the population served by a federally funded program would advance no constitutional principle and would scarcely serve the interests of federalism. To the contrary, such a requirement would rigidify Congress’ efforts to empower States by partnering with them in the implementation of federal programs.
*625 Medicaid is a prototypical example of federal-state cooperation in serving the Nation’s general welfare. Rather than authorizing a federal agency to administer a uniform national health-care system for the poor, Congress offered States the opportunity to tailor Medicaid grants to their particular needs, so long as they remain within bounds set by federal law. In shaping Medicaid, Congress did not endeavor to fix permanently the terms participating States must meet; instead, Congress reserved the “right to alter, amend, or repeal” any provision of the Medicaid Act. 42 U. S. C. § 1304. States, for their part, agreed to amend their own Medicaid plans consistent with changes from time to time made in the federal law. See 42 CPR § 430.12(c)(i) (2011). And from 1965 to the present, States have regularly conformed to Congress’ alterations of the Medicaid Act.
The Chief Justice acknowledges that Congress may “condition the receipt of [federal] funds on the States’ complying with restrictions on the use of those funds,” ante, at 580, but nevertheless concludes that the 2010 expansion is unduly coercive. His conclusion rests on three premises, each of them essential to his theory. First, the Medicaid expansion is, in The Chief Justice’s view, a new grant program, not an addition to the Medicaid program existing before the ACA’s enactment. Congress, The Chief Justice maintains, has threatened States with the loss of funds from an old program in an effort to get them to adopt a new one. Second, the expansion was unforeseeable by the States when they first signed on to Medicaid. Third, the threatened loss of funding is so large that the States have no real choice but to participate in the Medicaid expansion. The Chief Justice therefore—for the first time ever—finds an exercise of Congress’ spending power unconstitutionally coercive.
Medicaid, as amended by the ACA, however, is not two spending programs; it is a single program with a constant aim—to enable poor persons to receive basic health care when they need it. Given past expansions, plus express *626 statutory warning that Congress may change the requirements participating States must meet, there can be no tenable claim that the ACA fails for lack of notice. Moreover, States have no entitlement to receive any Medicaid funds; they enjoy only the opportunity to accept funds on Congress’ terms. Future Congresses are not bound by their predecessors’ dispositions; they have authority to spend federal revenue as they see fit. The Federal Government, therefore, is not, as The Chief Justice charges, threatening States with the loss of “existing” funds from one spending program in order to induce them to opt into another program. Congress is simply requiring States to do what States have long been required to do to receive Medicaid funding: comply with the conditions Congress prescribes for participation.
A majority of the Court, however, buys the argument that prospective withholding of funds formerly available exceeds Congress’ spending power. Given that holding, I entirely agree with The Chief Justice as to the appropriate remedy. It is to bar the withholding found impermissible—not, as the joint dissenters would have it, to scrap the expansion altogether, see post, at 689-691. The dissenters’ view that the ACA must fall in its entirety is a radical departure from the Court’s normal course. When a constitutional infirmity mars a statute, the Court ordinarily removes the infirmity. It undertakes a salvage operation; it does not demolish the legislation. See, e. g., Brockett v. Spokane Arcades, Inc., 472 U. S. 491, 504 (1985) (Court’s normal course is to declare a statute invalid “to the extent that it reaches too far, but otherwise [to leave the statute] intact”). That course is plainly in order where, as here, Congress has expressly instructed courts to leave untouched every provision not found invalid. See 42 U. S. C. § 1308. Because The Chief Justice finds the withholding—not the granting—of federal funds incompatible with the Spending Clause, Congress’ extension of Medicaid remains available to any State that affirms its willingness to participate.
*627 A
Expansion has been characteristic of the Medicaid program. Akin to the ACA in 2010, the Medicaid Act as passed in 1965 augmented existing federal grant programs jointly administered with the States.[13] States were not required to participate in Medicaid. But if they did, the Federal Government paid at least half the costs. To qualify for these grants, States had to offer a minimum level of health coverage to beneficiaries of four federally funded, state-administered welfare programs: Aid to Families with Dependent Children; Old Age Assistance; Aid to the Blind; and Aid to the Permanently and Totally Disabled. See Social Security Amendments of 1965, § 121(a), 79 Stat. 343; Schweiker v. Gray Panthers, 453 U. S. 34, 37 (1981). At their option, States could enroll additional “medically needy” individuals; these costs, too, were partially borne by the Federal Government at the same, at least 50%, rate. Ibid.
Since 1965, Congress has amended the Medicaid program on more than 50 occasions, sometimes quite sizably. Most relevant here, between 1988 and 1990, Congress required participating States to include among their beneficiaries pregnant women with family incomes up to 133% of the federal poverty level, children up to age 6 at the same income levels, and children ages 6 to 18 with family incomes up to 100% of the poverty level. See 42 U. S. C. *628 §§ 1396a(a)(10)(A)(i), 1396a(l); Medicare Catastrophic Coverage Act of 1988, §302, 102 Stat. 750; Omnibus Budget Reconciliation Act of 1989, §6401, 103 Stat. 2258; Omnibus Budget Reconciliation Act of 1990, §4601,104 Stat. 1388-166. These amendments added millions to the Medicaid-eligible population. Dubay & Kenney, Lessons From the Medicaid Expansions for Children and Pregnant Women 5 (Apr. 1997).
Between 1966 and 1990, annual federal Medicaid spending grew from $631.6 million to $42.6 billion; state spending rose to $31 billion over the same period. See Dept, of Health and Human Services, National Health Expenditures by Type of Service and Source of Funds: Calendar Years 1960 to 2010 (Table).[14] And between 1990 and 2010, federal spending increased to $269.5 billion. Ibid. Enlargement of the population and services covered by Medicaid, in short, has been the trend.
Compared to past alterations, the ACA is notable for the extent to which the Federal Government will pick up the tab. Medicaid’s 2010 expansion is financed largely by federal outlays. In 2014, federal funds will cover 100% of the costs for newly eligible beneficiaries; that rate will gradually decrease before settling at 90% in 2020. 42 U. S. C. § 1396d(y) (2006 ed., Supp. IV). By comparison, federal contributions toward the care of beneficiaries eligible pre-ACA range from 50% to 83%, and averaged 57% between 2005 and 2008. § 1396d(b) (2006 ed., Supp. IV); Dept, of Health and Human Services, Centers for Medicare and Medicaid Services, C. Truffer et al., 2010 Actuarial Report on the Financial Outlook for Medicaid, p. 20.
Nor will the expansion exorbitantly increase state Medicaid spending. The Congressional Budget Office (CBO) projects that States will spend 0.8% more than they would have, absent the ACA. See CBO, Spending & Enrollment Detail for CBO’s March 2009 Baseline. But see ante, at 575 *629 (“[T]he Act dramatically increases state obligations under Medicaid.”); post, at 688 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.) (“ [Acceptance of the [ACA expansion] will impose very substantial costs on participating States.”). Whatever the increase in state obligations after the ACA, it will pale in comparison to the increase in federal funding.[15]
Finally, any fair appraisal of Medicaid would require acknowledgment of the considerable autonomy States enjoy under the Act. Far from “conscripting] state agencies into the national bureaucratic army,” ante, at 585 (citing FERC v. Mississippi, 456 U. S. 742, 775 (1982) (O’Connor, J., concurring in judgment in part and dissenting in part); some brackets and internal quotation marks omitted), Medicaid “is designed to advance cooperative federalism,” Wisconsin Dept. of Health and Family Servs. v. Blumer, 534 U. S. 473, 495 (2002) (citing Harris v. McRae, 448 U. S. 297, 308 (1980)). Subject to its basic requirements, the Medicaid Act empowers States to “select dramatically different levels of funding and coverage, alter and experiment with different financing and delivery modes, and opt to cover (or not to cover) a range of particular procedures and therapies. States have leveraged this policy discretion to generate a myriad of dramatically different Medicaid programs over the past several decades.” Ruger, Of Icebergs and Glaciers, 75 Law & Contemp. Prob. 215, 233 (2012) (footnote omitted). The ACA does not jettison this approach. States, as first-line administrators, will continue to guide the distribution of substantial resources among their needy populations.
*630 The alternative to conditional federal spending, it bears emphasis, is not state autonomy but state marginalization.[16] In 1965, Congress elected to nationalize health coverage for seniors through Medicare. It could similarly have established Medicaid as an exclusively federal program. Instead, Congress gave the States the opportunity to partner in the program’s administration and development. Absent from the nationalized model, of course, is the state-level policy discretion and experimentation that is Medicaid’s hallmark; undoubtedly the interests of federalism are better served when States retain a meaningful role in the implementation of a program of such importance. See Caminker, State Sovereignty and Subordinacy, 95 Colum. L. Rev. 1001, 1002-1003 (1995) (cooperative federalism can preserve “a significant role for state discretion in achieving specified federal goals, where the alternative is complete federal preemption of any state regulatory role”); Rose-Ackerman, Cooperative Federalism and Co-optation, 92 Yale L. J. 1344, 1346 (1983) (“If the federal government begins to take full responsibility for social welfare spending and preempts the states, the result is likely to be weaker . . . state governments.”).[17]
Although Congress “has no obligation to use its Spending Clause power to disburse funds to the States,” College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense *631 Bd., 527 U. S. 666, 686 (1999), it has provided Medicaid grants notable for their generosity and flexibility. “[S]uch funds,” we once observed, “are gifts,” id., at 686-687, and so they have remained through decades of expansion in their size and scope.
B
The Spending Clause authorizes Congress “to pay the Debts and provide for the .. . general Welfare of the United States.” Art. I, § 8, cl. 1. To ensure that federal funds granted to the States are spent “to ‘provide for the . . . general Welfare’ in the manner Congress intended,” ante, at 576, Congress must of course have authority to impose limitations on the States’ use of the federal dollars. This Court, time and again, has respected Congress’ prescription of spending conditions, and has required States to abide by them. See, e. g., Pennhurst, 451 U. S., at 17 (“[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States.”). In particular, we have recognized Congress’ prerogative to condition a State’s receipt of Medicaid funding on compliance with the terms Congress set for participation in the program. See, e. g., Harris, 448 U. S., at 301 (“[O]nce a State elects to participate [in Medicaid], it must comply with the requirements of [the Medicaid Act].”); Arkansas Dept. of Health and Human Servs. v. Ahlborn, 547 U. S. 268, 275 (2006); Frew v. Hawkins, 540 U. S. 431, 433 (2004); Atkins v. Rivera, 477 U. S. 154, 156-157 (1986).
Congress’ authority to condition the use of federal funds is not confined to spending programs as first launched. The Legislature may, and often does, amend the law, imposing new conditions grant recipients henceforth must meet in order to continue receiving funds. See infra, at 639 (describing Bennett v. Kentucky Dept. of Ed., 470 U. S. 656, 659-660 (1985) (enforcing restriction added five years after adoption of educational program)).
Yes, there are federalism-based limits on the use of Congress’ conditional spending power. In the leading decision *632 in this area, South Dakota v. Dole, 483 U. S. 203 (1987), the Court identified four criteria. The conditions placed on federal grants to States must (1) promote the “general welfare,” (2) “unambiguously” inform States what is demanded of them, (3) be germane “to the federal interest in particular national projects or programs,” and (4) not “induce the States to engage in activities that would themselves be unconstitutional.” Id., at 207-208, 210 (internal quotation marks omitted).[18]
The Court in Dole mentioned, but did not adopt, a further limitation, one hypothetically raised a half-century earlier: In “some circumstances,” Congress might be prohibited from offering a “financial inducement ... so coercive as to pass the point at which ‘pressure turns into compulsion.’” Id., at 211 (quoting Steward Machine Co. v. Davis, 301 U. S. 548, 590 (1937)). Prior to today’s decision, however, the Court has never ruled that the terms of any grant crossed the indistinct line between temptation and coercion.
Dole involved the National Minimum Drinking Age Act, 23 U. S. C. § 158, enacted in 1984. That Act directed the Secretary of Transportation to withhold 5% of the federal highway funds otherwise payable to a State if the State permitted purchase of alcoholic beverages by persons less than 21 years old. Drinking age was not within the authority of Congress to regulate, South Dakota argued, because the Twenty-First Amendment gave the States exclusive power to control the manufacture, transportation, and consumption of alcoholic beverages. The small percentage of highway-construction funds South Dakota stood to lose by adhering to 19 as the age of eligibility to purchase 3.2% beer, however, was not enough to qualify as coercion, the Court concluded.
*633 This litigation does not present the concerns that led the Court in Dole even to consider the prospect of coercion. In Dole, the condition—set 21 as the minimum drinking age— did not tell the States how to use funds Congress provided for highway construction. Further, in view of the Twenty-First Amendment, it was an open question whether Congress could directly impose a national minimum drinking age.
The ACA, in contrast, relates solely to the federally funded Medicaid program; if States choose not to comply, Congress has not threatened to withhold funds earmarked for any other program. Nor does the ACA use Medicaid funding to induce States to take action Congress itself could not undertake. The Federal Government undoubtedly could operate its own health-care program for poor persons, just as it operates Medicare for seniors’ health care. See supra, at 630.
That is what makes this such a simple case, and the Court’s decision so unsettling. Congress, aiming to assist the needy, has appropriated federal money to subsidize state health-insurance programs that meet federal standards. The principal standard the ACA sets is that the state program cover adults earning no more than 133% of the federal poverty line. Enforcing that prescription ensures that federal funds will be spent on health care for the poor in furtherance of Congress’ present perception of the general welfare.
C
The Chief Justice asserts that the Medicaid expansion creates a “new health care program.” Ante, at 584. Moreover, States could “hardly anticipate” that Congress would “transform [the program] so dramatically.” Ibid. Therefore, The Chief Justice maintains, Congress’ threat to withhold “old” Medicaid funds based on a State’s refusal to participate in the “new” program is a “threa[t] to terminate [an]other . . . independent gran[t].” Ante, at 579-580, 584. And because the threat to withhold a large amount of funds *634 from one program “leaves the States with no real option but to acquiesce [in a newly created program],” The Chief Justice concludes, the Medicaid expansion is unconstitutionally coercive. Ante, at 582.
1
The starting premise on which The Chief Justice’s coercion analysis rests is that the ACA did not really “extend” Medicaid; instead, Congress created an entirely new program to coexist with the old. The Chief Justice calls the ACA new, but in truth, it simply reaches more of America’s poor than Congress originally covered.
Medicaid was created to enable States to provide medical assistance to “needy persons.” See S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 9 (1965). See also § 121(a), 79 Stat. 343 (The purpose of Medicaid is to enable States “to furnish . . . medical assistance on behalf of [certain persons] whose income and resources are insufficient to meet the costs of necessary medical services.”). By bringing health care within the reach of a larger population of Americans unable to afford it, the Medicaid expansion is an extension of that basic aim.
The Medicaid Act contains hundreds of provisions governing operation of the program, setting conditions ranging from “Limitation on payments to States for expenditures attributable to taxes,” 42 U. S. C. § 1396a(t) (2006 ed.), to “Medical assistance to aliens not lawfully admitted for permanent residence,” §1396b(v) (2006 ed. and Supp. IV). The Medicaid expansion leaves unchanged the vast majority of these provisions; it adds beneficiaries to the existing program and specifies the rate at which States will be reimbursed for services provided to the added beneficiaries. See ACA § 2001(a)(1), (3), 124 Stat. 271-272. The ACA does not describe operational aspects of the program for these newly eligible persons; for that information, one must read the existing Medicaid Act. See 42 U. S. C. §§ 1396-1396v(b) (2006 ed. and Supp. IV).
*635 Congress styled and clearly viewed the Medicaid expansion as an amendment to the Medicaid Act, not as a “new” health-care program. To the four categories of beneficiaries for whom coverage became mandatory in 1965, and the three mandatory classes added in the láte 1980’s, see supra, at 627-628, the ACA adds an eighth: individuals under 65 with incomes not exceeding 133% of the federal poverty level. The expansion is effectuated by §2001 of the ACA, aptly titled: “Medicaid Coverage for the Lowest Income Populations.” 124 Stat. 271. That section amends Title 42, Chapter 7, Sub-chapter XIX: Grants to States for Medical Assistance Programs. Commonly known as the Medicaid Act, Subchapter XIX filled some 278 pages in 2006. Section 2001 of the ACA would add approximately three pages.[19]
Congress has broad authority to construct or adjust spending programs to meet its contemporary understanding of “the general Welfare.” Helvering v. Davis, 301 U. S. 619, 640-641 (1937). Courts owe a large measure of respect to Congress’ characterization of the grant programs it establishes. See Steward Machine, 301 U. S., at 594. Even if courts were inclined to second-guess Congress’ conception of the character of its legislation, how would reviewing judges divine whether an Act of Congress, purporting to amend a law, is in reality not an amendment, but a new creation? At what point does an extension become so large that it “transforms” the basic law?
Endeavoring to show that Congress created a new program, The Chief Justice cites three aspects of the expansion. First, he asserts that, in covering those earning no more than 133% of the federal poverty line, the Medicaid expansion, unlike pre-ACA Medicaid, does not “care for the neediest among us.” Ante, at 583. What makes that so? *636 Single adults earning no more than $14,856 per year—133% of the current federal poverty level—surely rank among the Nation’s poor.
Second, according to The Chief Justice, “Congress mandated that newly eligible persons receive a level of coverage that is less comprehensive than the traditional Medicaid benefit package.” Ante, at 584. That less comprehensive benefit package, however, is not an innovation introduced by the ACA; since 2006, States have been free to use it for many of their Medicaid beneficiaries.[20] The level of benefits offered therefore does not set apart post-ACA Medicaid recipients from all those entitled to benefits pre-ACA.
Third, The Chief Justice correctly notes that the reimbursement rate for participating States is different regarding individuals who became Medicaid-eligible through the ACA. Ibid. But the rate differs only in its generosity to participating States. Under pre-ACA Medicaid, the Federal Government pays up to 83% of the costs of coverage for current enrollees, § 1396d(b) (2006 ed. and Supp. IV); under the ACA, the federal contribution starts at 100% and will eventually settle at 90%, § 1396d(y). Even if one agreed that a change of as little as 7 percentage points carries constitutional significance, is it not passing strange to suggest that the purported incursion on state sovereignty might have been averted, or at least mitigated, had Congress offered States less money to carry out the same obligations?
Consider also that Congress could have repealed Medicaid. See supra, at 624-625 (citing 42 U. S. C. § 1304); Brief for Petitioners in No. 11-400, p. 41. Thereafter, Congress could have enacted Medicaid II, a new program combining the pre-2010 coverage with the expanded coverage required by the *637 ACA. By what right does a court stop Congress from building up without first tearing down?
2
The Chief Justice finds the Medicaid expansion vulnerable because it took participating States by surprise. Ante, at 584. “A State could hardly anticipate that Congres[s]” would endeavor to “transform [the Medicaid program] so dramatically,” he states. Ibid. For the notion that States must be able to foresee, when they sign up, alterations Congress might make later on, The Chief Justice cites only one case: Pennhurst State School and Hospital v. Halderman, 451 U. S. 1.
In Pennhurst, residents of a state-run, federally funded institution for the mentally disabled complained of abusive treatment and inhumane conditions in alleged violation of the Developmentally Disabled Assistance and Bill of Rights Act. 451 U. S., at 5-6. We held that the State was not answerable in damages for violating conditions it did not “voluntarily and knowingly aceep[t].” Id., at 17, 27. Inspecting the statutory language and legislative history, we found that the Act did not “unambiguously” impose the requirement on which plaintiffs relied: that they receive appropriate treatment in the least restrictive environment. Id., at 17-18. Satisfied that Congress had not clearly conditioned the States’ receipt of federal funds on the States’ provision of such treatment, we declined to read such a requirement into the Act. Congress’ spending power, we concluded, “does not include surprising participating States with postacceptance or ‘retroactive’ conditions.” Id., at 24-25.
Pennhurst thus instructs that “if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.” Ante, at 583 (quoting Pennhurst, 451 U. S., at 17). That requirement is met here. Section 2001 does not take effect until 2014. The ACA makes perfectly clear what will be required of States that accept Medicaid funding after *638 that date: They must extend eligibility to adults with incomes no more than 133% of the federal poverty line. See 42 U. S. C. § 1396a(a)(10)(A)(i)(VIII) (2006 ed. and Supp. IV).
The Chief Justice appears to find in Pennhurst a requirement that, when spending legislation is first passed, or when States first enlist in the federal program, Congress must provide clear notice of conditions it might later impose. If I understand his point correctly, it was incumbent on Congress, in 1965, to warn the States clearly of the size and shape potential changes to Medicaid might take. And absent such notice, sizable changes could not be made mandatory. Our decisions do not support such a requirement.[21]
In Bennett v. New Jersey, 470 U. S. 632 (1985), the Secretary of Education sought to recoup Title I funds[22] based on the State’s noncompliance, from 1970 to 1972, with a 1978 amendment to Title I. Relying on Pennhurst, we rejected the Secretary’s attempt to recover funds based on the States’ alleged violation of a rule that did not exist when the State accepted and spent the funds. See 470 U. S., at 640 (“New Jersey[,] when it applied for and received Title I funds for the years 1970-1972[,] had no basis to believe that the propriety of the expenditures would be judged by any standards other than the ones in effect at the time.” (citing Pennhurst, 451 U. S., at 17, 24-25; emphasis added)).
*639 When amendment of an existing grant program has no such retroactive effect, however, we have upheld Congress’ instruction. In Bennett v. Kentucky Dept. of Ed., 470 U. S. 656 (1985), the Secretary sued to recapture Title I funds based on the Commonwealth’s 1974 violation of a spending condition Congress added to Title I in 1970. Rejecting Kentucky’s argument pinned to Pennhurst, we held that the Commonwealth suffered no surprise after accepting the federal funds. Kentucky was therefore obliged to return the money. 470 U. S., at 665-666, 673-674. The conditions imposed were to be assessed as of 1974, in light of “the legal requirements in place when the grants were made,” id., at 670, not as of 1965, when Title I was originally enacted.
As these decisions show, Pennhurst’s rule demands that conditions on federal funds be unambiguously clear at the time a State receives and uses the money—not at the time, perhaps years earlier, when Congress passed the law establishing the program. See also Dole, 483 U. S., at 208 (finding Pennhurst satisfied based on the clarity of the Federal Aid Highway Act as amended in 1984, without looking back to 1956, the year of the Act’s adoption).
In any event, from the start, the Medicaid Act put States on notice that the program could be changed: “The right to alter, amend, or repeal any provision of [Medicaid],” the statute has read since 1965, “is hereby reserved to the Congress.” 42 U. S. C. § 1304. The “effect of these few simple words” has long been settled. See National Railroad Passenger Corporation v. Atchison, T. & S. F. R. Co., 470 U. S. 451, 467-468, n. 22 (1985) (citing Sinking Fund Cases, 99 U. S. 700, 720 (1879)). By reserving the right to “alter, amend, [or] repeal” a spending program, Congress “has given special notice of its intention to retain . . . full and complete power to make such alterations and amendments ... as come within the just scope of legislative power.” Id., at 720.
Our decision in Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U. S. 41, 51-52 (1986), is *640 guiding here. As enacted in 1935, the Social Security Act did not cover state employees. Id., at 44. In response to pressure from States that wanted coverage for their employees, Congress, in 1950, amended the Act to allow States to opt into the program. Id., at 45. The statutory provision giving States this option expressly permitted them to withdraw from the program. Ibid.
Beginning in the late 1970’s, States increasingly exercised the option to withdraw. Id., at 46. Concerned that withdrawals were threatening the integrity of Social Security, Congress repealed the termination provision. Congress thereby changed Social Security from a program voluntary for the States to one from which they could not escape. Id., at 48. California objected, arguing that the change imper-missibly deprived it of a right to withdraw from Social Security. Id., at 49-50. We unanimously rejected California’s argument. Id., at 51-53. By including in the Act “a clause expressly reserving to it ‘[t]he right to alter, amend, or repeal any provision’ of the Act,” we held, Congress put States on notice that the Act “created no contractual rights.” Id., at 51-52 (some internal quotation marks omitted). The States therefore had no law-based ground on which to complain about the amendment, despite the significant character of the change.
The Chief Justice nevertheless would rewrite § 1304 to countenance only the “right to alter somewhat,” or “amend, but not too much.” Congress, however, did not so qualify § 1304. Indeed, Congress retained discretion to “repeal” Medicaid, wiping it out entirely. Cf. Delta Air Lines, Inc. v. August, 450 U. S. 346, 368 (1981) (Rehnquist, J., dissenting) (invoking “the common-sense maxim that the greater includes the lesser”). As Bowen indicates, no State could reasonably have read § 1304 as reserving to Congress authority to make adjustments only if modestly sized.
In fact, no State proceeded on that understanding. In compliance with Medicaid regulations, each State expressly *641 undertook to abide by future Medicaid changes. See 42 CFR § 430.12(c)(1) (2011) (“The [state Medicaid] plan must provide that it will be amended whenever necessary to reflect . . . [e]hanges in Federal law, regulations, policy interpretations, or court decisions.”)- Whenever a State notifies the Federal Government of a change in its own Medicaid program, the State certifies both that it knows the federally set terms of participation may change, and that it will abide by those changes as a condition of continued participation. See, e. g., Florida Agency for Health Care Admin., State Plan Under Title XIX of the Social Security Act Medical Assistance Program § 7.1, p. 86 (Oct. 6, 1992).
The Chief Justice insists that the most recent expansion, in contrast to its predecessors, “accomplishes a shift in kind, not merely degree.” Ante, at 583. But why was Medicaid altered only in degree, not in kind, when Congress required States to cover millions of children and pregnant women? See supra, at 627-628. Congress did not “merely alte[r] and expan[d] the boundaries of” the Aid to Families with Dependent Children program. But see ante, at 583-585. Rather, Congress required participating States to provide coverage tied to the federal poverty level (as it later did in the ACA), rather than to the AFDC program. See Brief for National Health Law Program et al. as Amici Curiae 16-18. In short, given §1304, this Court’s construction of § 1304⅛ language in Bowen, and the enlargement of Medicaid in the years since 1965,[23] a State would be hard put to complain that it lacked fair notice when, in 2010, Congress altered Medicaid to embrace a larger portion of the Nation’s poor.
*642 3
The Chief Justice ultimately asks whether “the financial inducement offered by Congress . . . passfed] the point at which pressure turns into compulsion.” Ante, at 580 (internal quotation marks omitted). The financial inducement Congress employed here, he concludes, crosses that threshold: The threatened withholding of “existing Medicaid funds” is “a gun to the head” that forces States to acquiesce. Ante, at 579-580, 581 (citing 42 U. S. C. § 1396c).[24]
The Chief Justice sees no need to “fix the outermost line,” Steward Machine, 301 U. S., at 591, “where persuasion gives way to coercion,” ante, at 585. Neither do the joint dissenters. See post, at 679, 681.[25] Notably, the decision on *643 which they rely, Steward Machine, found the statute at issue inside the line, “wherever the line may be.” 301 U. S., at 591.
When future Spending Clause challenges arrive, as they likely will in the wake of today’s decision, how will litigants and judges assess whether “a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds”? Ante, at 578. Are courts to measure the number of dollars the Federal Government might withhold for noncompliance? The portion of the State’s budget at stake? And which State’s—or States’—budget is determinative: the lead plaintiff, all challenging States (26 in this litigation, many with quite different fiscal situations), or some national median? Does it matter that Florida, unlike most States, imposes no state income tax, and therefore might be able to replace foregone federal funds with new state revenue?[26] *644 Or that the coercion state officials in fact fear is punishment at the ballot box for turning down a politically popular federal grant?
The coercion inquiry, therefore, appears to involve political judgments that defy judicial calculation. See Baker v. Carr, 369 U. S. 186, 217 (1962). Even commentators sympathetic to robust enforcement of Dole’s limitations, see supra, at 631-632, have concluded that conceptions of “impermissible coercion” premised on States’ perceived inability to decline federal funds “are just too amorphous to be judicially administrable.” Baker & Berman, Getting Off the Dole, 78 Ind. L. J. 469, 521, 522, n. 307 (2003) (citing, e. g., Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989)).
At bottom, my colleagues’ position is that the States’ reliance on federal funds limits Congress’ authority to alter its spending programs. This gets things backwards: Congress, not the States, is tasked with spending federal money in service of the general welfare. And each successive Congress is empowered to appropriate funds as it sees fit. When the 110th Congress reached a conclusion about Medicaid funds that differed from its predecessors’ view, it abridged no State’s right to “existing,” or “pre-existing,” funds. But see ante, at 581-582; post, at 689-691 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.). For, in fact, there are no such funds. There is only money States anticipate receiving from future Congresses.
*645 D
Congress has delegated to the Secretary of Health and Human Services the authority to withhold, in whole or in part, federal Medicaid funds fróm States that fail to comply with the Medicaid Act as originally composed and as subsequently amended. 42 U. S. C. § 1396c.[27] The Chief Justice, however, holds that the Constitution precludes the Secretary from withholding “existing” Medicaid funds based on States’ refusal to comply with the expanded Medicaid program. Ante, at 585. For the foregoing reasons, I disagree that any such withholding would violate the Spending Clause. Accordingly, I would affirm the decision of the Court of Appeals for the Eleventh Circuit in this regard.
But in view of The Chief Justice’s disposition, I agree with him that the Medicaid Act’s severability clause determines the appropriate remedy. That clause provides that “[i]f any provision of [the Medicaid Act], or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby.” 42 U. S. C. § 1303.
The Court does not strike down any provision of the ACA. It prohibits only the “application” of the Secretary’s authority to withhold Medicaid funds from States that decline to conform their Medicaid plans to the ACA’s requirements. Thus the ACA’s authorization of funds to finance the expan *646 sion remains intact, and the Secretary’s authority to withhold funds for reasons other than noncompliance with the expansion remains unaffected.
Even absent § 1303⅛ command, we would have no warrant to invalidate the Medicaid expansion, contra post, at 689-691 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.), not to mention the entire ACA, post, at 691-706 (same). For when a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislature’s dominant objective. See, e. g., Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 328-330 (2006). In this instance, that objective was to increase access to health care for the poor by increasing the States’ access to federal funds. The Chief Justice is undoubtedly right to conclude that Congress may offer States funds “to expand the availability of health care, and requir[e] that States accepting such funds comply with the conditions on their use.” Ante, at 585. I therefore concur in the judgment with respect to Part IV-B of The Chief Justice’s opinion.
* * *
For the reasons stated, I agree with The Chief Justice that, as to the validity of the minimum coverage provision, the judgment of the Court of Appeals for the Eleventh Circuit should be reversed. In my view, the provision encounters no constitutional obstruction. Further, I would uphold the Eleventh Circuit’s decision that the Medicaid expansion is within Congress’ spending power.

 According to one study conducted by the National Center for Health Statistics, the high cost of insurance is the most common reason why individuals lack coverage, followed by loss of one’s job, an employer’s unwillingness to offer insurance or an insurers’ unwillingness to cover those with preexisting medical conditions, and loss of Medicaid coverage. See Dept, of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for the U. S. Population: National Health Interview Survey—2009, Ser. 10, No. 248, p. 71 (Dec. 2010) (Table 25). “[D]id not want or need coverage” received too few responses to warrant its own category. See ibid., n. 2.

 Despite its success, Massachusetts’ medical-care providers still administer substantial amounts of uncompensated care, much of that to uninsured patients from out of State. See supra, at 595.

 Alexander Hamilton described the problem this way: “[Often] it would be beneficial to all the states to encourage, or suppress[,] a particular branch of trade, while it would be detrimental ... to attempt it without the concurrence of the rest.” The Continentalist No. V, in 3 Papers of Alexander Hamilton 75, 78 (H. Syrett ed. 1962). Because the concurrence of all States was exceedingly difficult to obtain, Hamilton observed, “the experiment would probably be left untried.” Ibid.

 See Dept, of Health and Human Services, National Center for Health Statistics, Summary Health Statistics for U. S. Adults: National Health Interview Survey 2009, Ser. 10, No. 249, p. 124 (Dec. 2010) (Table 37).

 Echoing The Chief Justice, the joint dissenters urge that the minimum coverage provision impermissibly regulates young people who “have no intention of purchasing [medical care]” and are too far “removed from the [health-care] market.” See post, at 652, 656. This criticism ignores the reality that a healthy young person may be a day away from needing health care. See supra, at 591. A victim of an accident or unforeseen illness will consume extensive medical care immediately, though scarcely expecting to do so.

 The Chief Justice’s reliance on the quoted passages of the Constitution, see ante, at 550, is also dubious on other grounds. The power to “regulate the Value” of the national currency presumably includes the power to increase the currency’s worth—i. e., to create value where none previously existed. And if the power to “[r]egulat[e] . . . the land and *611 naval Forces” presupposes “there is already [in existence] something to be regulated,” i. e., an Army and a Navy, does Congress lack authority to create an Air Force?

 The Chief Justice’s characterization of individuals who choose not to purchase private insurance as “doing nothing,” ante, at 552, is similarly questionable. A person who self-insures opts against prepayment for a product the person will in time consume. When aggregated, exercise of that option has a substantial impact on the health-care market. See supra, at 592-594, 604.

 Some adherents to the joint dissent have questioned the existence of substantive due process rights. See McDonald v. Chicago, 561 U. S. 742, 811 (2010) (Thomas, J., concurring) (The notion that the Due Process Clause “could define the substance of th[e] righ[t to liberty] strains credulity.”); Albright v. Oliver, 510 U. S. 266, 275 (1994) (Scalia, J., concurring) (“I reject the proposition that the Due Process Clause guarantees certain *614 (unspecified) liberties.”). Given these Justices’ reluctance to interpret the Due Process Clause as guaranteeing liberty interests, their willingness to plant such protections in the Commerce Clause is striking.

 The failure to purchase vegetables in The Chief Justice’s hypothetical, then, is not what leads to higher health-care costs for others; rather, it is the failure of individuals to maintain a healthy diet, and the resulting obesity, that creates the cost-shifting problem. See ante, at *616 553-564. Requiring individuals to purchase vegetables is thus several steps removed from solving the problem. The failure to obtain health insurance, by contrast, is the immediate cause of the cost shifting Congress sought to address through the ACA. See supra, at 592-594. Requiring individuals to obtain insurance attacks the source of the problem directly, in a single step.

 Indeed, Congress regularly and uncontroversially requires individuals who are “doing nothing,” see ante, at 552, to take action. Examples include federal requirements to report for jury duty, 28 U. S. C. § 1866(g) (2006 ed., Supp. IV); to register for selective service, 50 U. S. C. App. § 453; to purchase firearms and gear in anticipation of service in the Militia, 1 Stat. 271 (Uniform Militia Act of 1792); to turn gold currency over to the Federal Government in exchange for paper currency, see Nortz v. United States, 294 U. S. 317, 328 (1935); and to file a tax return, 26 U. S. C. § 6012 (2006 ed., Supp. IV).

 In a separate argument, the joint dissenters contend that the minimum coverage provision is not necessary and proper because it was not the “only . . . way” Congress could have made the guaranteed-issue and community-rating reforms work. Post, at 654. Congress could also have avoided an insurance-market death spiral, the dissenters maintain, by imposing a surcharge on those who did not previously purchase insurance when those individuals eventually enter the health-insurance system. Ibid. Or Congress could “den[y] a Ml income tax credit” to those who do not purchase insurance. Post, at 654-655.
Neither a surcharge on those who purchase insurance nor the denial of a tax credit to those who do not would solve the problem created by *623 guaranteed-issue and community-rating requirements. Neither would prompt the purchase of insurance before sickness or injury occurred.
But even assuming there were “practicable” alternatives to the minimum coverage provision, “we long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be ‘absolutely necessary’ to the exercise of an enumerated power.” Jinks v. Richland County, 538 U. S. 456, 462 (2003) (quoting McCulloch v. Maryland, 4 Wheat. 316, 414-415 (1819)). Rather, the statutory provision at issue need only be “conducive” and “[reasonably] adapted” to the goal Congress seeks to achieve. Jinks, 538 U. S., at 462 (internal quotation marks omitted). The minimum coverage provision meets this requirement. See supra, at 619-620.

 The Chief Justice states that he must evaluate the constitutionality of the minimum coverage provision under the Commerce Clause because the provision “reads more naturally as a command to buy insurance than as a tax.” Ante, at 574. The Chief Justice ultimately concludes, however, that interpreting the provision as a tax is a “fairly possible” con *624 struction. Ante, at 563 (internal quotation marks omitted). That being so, I see no reason to undertake a Commerce Clause analysis that is not outcome determinative.

 Medicaid was “plainly an extension of the existing Kerr-Mills” grant program. Huberfeld, Federalizing Medicaid, 14 U. Pa. J. Const. L. 431, 444-445 (2011). Indeed, the “section of the Senate report dealing with Title XIX”—the title establishing Medicaid—“was entitled, ‘Improvement and Extension of Kerr-Mills Medical Assistance Program.’” R. Stevens & R. Stevens, Welfare Medicine in America 51 (1974) (quoting S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 9 (1965)). Setting the pattern for Medicaid, Kerr-Mills reimbursed States for a portion of the cost of health care provided to welfare recipients if States met conditions specified in the federal law, e. g., participating States were obliged to offer minimum coverage for hospitalization and physician services. See Huberfeld, supra, at 443-444.

 Available online at http://www.cms.gov/Researeh-Statistics-Data- and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/ NationalHealthAeeountsHistorieal.html.

 Even the study on which plaintiffs rely, see Brief for Petitioners in No. 11-400, p. 10, concludes that “[w]hile most states will experience some increase in spending, this is quite small relative to the federal matching payments and low relative to the costs of uncompensated care that [the States] would bear if the[re] were no health reform.” See Kaiser Commission on Medicaid & the Uninsured, Medicaid Coverage & Spending in Health Reform 16 (May 2010). Thus there can be no objection to the ACA’s expansion of Medicaid as an “unfunded mandate.” Quite the contrary, the program is impressively well funded.

 In 1972, for example, Congress ended the federal cash-assistance program for the aged, blind, and disabled. That program previously had been operated jointly by the Federal and State Governments, as is the case with Medicaid today. Congress replaced the cooperative federal program with the nationalized Supplemental Security Income program. See Schweiker v. Gray Panthers, 453 U. S. 34, 38 (1981).

 The Chief Justice and the joint dissenters perceive in cooperative federalism a “threa[t]” to “political accountability.” Ante, at 578; see post, at 678. By that, they mean voter confusion: Citizens upset by unpopular government action, they posit, may ascribe to state officials blame more appropriately laid at Congress’ door. But no such confusion is apparent in this case: Medicaid’s status as a federally funded, state-administered program is hardly hidden from view.

 Although plaintiffs, in the proceedings below, did not contest the ACA's satisfaction of these criteria, see 648 F. 3d 1235, 1263 (CA11 2011), The Chief ‘Justice appears to rely heavily on the second criterion. Compare ante, at 582, 584, with infra, at 639-641.

 Compare Subchapter XIX, 42 U. S. C. §§ 1396-1396v(b) (2006 ed. and Supp. IV), with §§1396a(a)(10)(A)(i)(VIII) (2006 ed. and Supp. IV), 1396a(a)(10)(A)(ii)(XX), 1396a(a)(75), 1396a(k), 1396a(gg) to (hh), 1396d(y), 1396r-1(e), 1396u-7(b)(5) to (6).

 The Deficit Reduction Act of 2005 authorized States to provide “benchmark coverage” or “benchmark equivalent coverage” to certain Medicaid populations. See § 6044, 120 Stat. 88, 42 U. S. C. § 1396u-7 (2006 ed. and Supp. IV). States may offer the same level of coverage to persons newly eligible under the ACA. See § 1396a(k).

 The Chief Justice observes that “Spending Clause legislation [i]s much in the nature of a contract.’’ Ante, at 577 (internal quotation marks omitted). See also post, at 676 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.) (same). But the Court previously has recognized that “[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.” Bennett v. Kentucky Dept. of Ed., 470 U. S. 656, 669 (1985).

 Title I of the Elementary and Secondary Education Act of 1965 provided federal grants to finance supplemental educational programs in school districts with high concentrations of children from low-income families. See Bennett v. New Jersey, 470 U. S. 632, 634-635 (1985) (citing Pub. L. 89-10, 79 Stat. 27).

 Note, in this regard, the extension of Social Security, which began in 1935 as an old-age pension program, then expanded to include survivor benefits in 1939 and disability benefits in 1956. See Social Security Act, ch. 531, 49 Stat. 622-625; Social Security Act Amendments of 1939, 53 Stat. 1364-1365; Social Security Amendments of 1956, ch. 836, § 103, 70 Stat. 815-816.

 The joint dissenters, for their part, would make this the entire inquiry. “[Ilf States really have no choice other than to accept the package,” they assert, “the offer is coercive.” Post, at 679. The Chief Justice recognizes Congress’ authority to construct a single federal program and “condition the receipt of funds on the States’ complying with restrictions on the use of those hinds.” Ante, at 680. For the joint dissenters, however, all that matters, it appears, is whether States can resist the temptation of a given federal grant. Post, at 678-679. On this logic, any federal spending program, sufficiently large and well funded, would be unconstitutional. The joint dissenters point to smaller programs States might have the will to refuse. See post, at 683-684 (elementary and secondary education). But how is a court to judge whether “only 6.6% of all state expenditures,” post, at 683, is an amount States could or would do without?
Speculations of this genre are characteristic of the joint dissent. See, e. g., post, at 678 (“it may be state officials who will bear the brunt of public disapproval” for joint federal-state endeavors); ibid, (“federal officials . . . may remain insulated from the electoral ramifications of their decision”); post, at 680 (“a heavy federal tax... levied to support a federal program that offers large grants to the States... may, as a practical matter, [leave States] unable to refuse to participate”); ibid, (withdrawal from a federal program “would likely force the State to impose a huge tax increase”); post, at 688 (state share of ACA expansion costs “may increase in the future” (all emphasis added; some internal quotation marks omitted)). The joint dissenters are long on conjecture and short on real-world examples.

 The joint dissenters also rely heavily on Congress’ perceived intent to coerce the States. Post, at 685-689; see, e. g., post, at 685 (“In crafting the ACA, Congress clearly expressed its informed view that no State *643 could possibly refuse the offer that the ACA extends.”). We should not lightly ascribe to Congress an intent to violate the Constitution (at least as my colleagues read it). This is particularly true when the ACA could just as well be comprehended as demonstrating Congress’ mere expectation, in light of the uniformity of past participation and the generosity of the federal contribution, that States would not withdraw. Cf. South Dakota v. Dole, 483 U. S. 203, 211 (1987) (“We cannot conclude . . . that a conditional grant of federal money... is unconstitutional simply by reason of its success in achieving the congressional objective.”).

 Federal taxation of a State’s citizens, according to the joint dissenters, may diminish a State’s ability to raise new revenue. This, in turn, could limit a State’s capacity to replace a federal program with an “equivalent” state-funded analog. Post, at 681. But it cannot be true that “the amount of the federal taxes extracted from the taxpayers of a State to pay for the program in question is relevant in determining whether there is impermissible coercion.” Post, at 680. When the United States Government taxes United States citizens, it taxes them “in their individual capacities” as “the people of America”—not as residents of a particular State. See U. S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 839 (1995) (Kennedy, J., concurring) (internal quotation marks omitted). That is because the “Framers split the atom of sovereigntyt,]... establishing two orders of government”—“one state and one federal”—“each with its own direct relationship” to the people. Id., at 838.
A State therefore has no claim on the money its residents pay in federal taxes, and federal “spending programs need not help people in all states *644 in the same measure.” See Brief for David Satcher et al. as Amici Curiae 19. In 2004, for example, New Jersey received 55 cents in federal spending for every dollar its residents paid to the Federal Government in taxes, while Mississippi received $1.77 per tax dollar paid. C. Dubay, Tax Foundation, Federal Tax Burdens and Expenditures by State: Which States Gain Most From Federal Fiscal Operations? 2 (Mar. 2006). Thus no constitutional problem was created when Arizona declined for 16 years to participate in Medicaid, even though its residents’ tax dollars financed Medicaid programs in every other State.

 As The Chief Justice observes, the Secretary is authorized to withhold all of a State’s Medicaid funding. See ante, at 581. But total withdrawal is what the Secretary may, not must, do. She has discretion to withhold only a portion of the Medicaid funds otherwise due a noncom-pliant State. See § 1396c; cf. 45 CFR § 80.10(f) (2011) (The Secretary may enforce Title Vi’s nondiscrimination requirement through “refusal to grant or continue Federal financial assistance, in whole or in part.” (emphasis added)). The Secretary, it is worth noting, may herself experience political pressures, which would make her all the more reluctant to cut off funds Congress has appropriated for a State’s needy citizens.